JANET MARIE DUVALL,                              Civil Action No. 16-11902

      Plaintiff,                              HON. ROBERT H. CLELAND
                                                U.S. District Judge
v.                                              HON. R. STEVEN WHALEN
                                                U.S. Magistrate Judge
COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Janet Marie Duvall ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Plaintiff's motion for summary judgment [Doc. #16] be GRANTED to the extent that the case be remanded for further administrative proceedings consistent with my findings in section **C** of the analysis, and that Defendant's motion for summary judgment [Doc. #21] be DENIED.

# I. PROCEDURAL HISTORY

On July 8, 2013, Plaintiff filed an application for DIB, alleging disability as of July 31, 2010 (Tr. 99-100). After the initial denial of the claim, she requested an administrative hearing, held on November 10, 2014 in Detroit, Michigan before Administrative Law Judge ("ALJ") Gregory Holiday (Tr. 28). Plaintiff, represented by attorney Caroline N. Gersch, testified (Tr. 31-52), as did Vocational Expert ("VE") James M. Fuller (Tr. 53-57). On December 16, 2014, ALJ Holiday found Plaintiff could perform her past relevant work as a vocational rehabilitation counselor (Tr. 10-23). On April 6, 2016, the Appeals Council denied review (Tr. 1-4). Plaintiff filed for judicial review of the Commissioner's decision on May 26, 2016.

# II. BACKGROUND FACTS

Plaintiff, born December 9, 1947, was 67 when the ALJ issued his decision (Tr. 23, 99). She completed four years of college and worked previously as a vocational rehabilitation counselor (Tr. 116). Her application for benefits alleges disability as a result of back problems and diabetes (Tr. 115).

## A. Plaintiff's Testimony

Plaintiff offered the following testimony:

At the time of the hearing, she weighed 175 pounds but previously weighed as much as 225 following chemotherapy for breast cancer (Tr. 32). She attributed her steady weight loss to cutting bread, potatoes, and rice from her diet (Tr. 32). She had been diagnosed with

diabetes and was currently taking Metformin (Tr. 32).

Her declared onset of disability date was July 31, 2010, but in reality, she became disabled in 2003 or 2004 due to whiplash (Tr. 33). She was able to continue work owing to the accommodations of her employer (Tr. 33). In 2005, she was diagnosed with breast cancer and underwent a lumpectomy followed by radiation (Tr. 33-34). She had been told that nothing could be done to remedy her neck problems (Tr. 34).

She experienced "horrible" back pain, particularly while sitting and at night (Tr. 35). She attempted to ease the pain with stretching and heat (Tr. 35). She experienced sleep disturbances due to back pain (Tr. 35-36). She used a right wrist brace since breaking her wrist in May, 2014 (Tr. 36-37). She generally required a cane for walking (Tr. 36-37). She was prone to falls due to dizziness and she also experienced knee pain that radiated into her feet (Tr. 37-38).

Plaintiff was unable to walk further than to and from the mailbox at the end of her driveway (Tr. 38). She lived in a one-story house (Tr. 39). She received help from a neighbor when descending the stairs to the basement on a weekly basis to do her laundry chores (Tr. 39-40). She cared for her personal needs but required the use of a shower stool and experienced difficulty fastening clothes due to the wrist problems (Tr. 41). She cooked large portions of food, and then heated them up in the microwave as needed (Tr. 41). She was able to make short shopping trips, but relied on her neighbor to help her unload heavy grocery items (Tr. 42). She was able to drive to a market three blocks from her house (Tr.

42), but she had not driven since breaking her wrist (Tr. 43-44). She was unable to grip a computer mouse due to wrist pain (Tr. 44).

Plaintiff also experienced radiating shoulder pain which was exacerbated by reaching (Tr. 44-45). She used a cell phone to make telephone calls and used the "microphone" function when texting (Tr. 45). She did not use social networking sites and preferred to see people "face-to-face or over the phone" (Tr. 46). She did not have close family members who were living (Tr. 46). She did not smoke, drink, or use street drugs (Tr. 47). She used reading glasses but nonetheless experienced vision problems due to glaucoma (Tr. 47). She had undergone chiropractic treatment (Tr. 48).

In response to questioning by her attorney, Plaintiff reported that as of 2010, she was unable to sit for more than 20 minutes without requiring a position change due to lower back and neck pain (Tr. 50). She reported that standing every 20 minutes interfered with her job as a rehabilitation counselor (Tr. 51). She was unable to lift more than two pounds or stand in one position for more than 10 minutes (Tr. 51).

### B. Medical Evidence

#### 1. Treating Records For the Relevant Period

October, 2003 imaging studies of the cervical spine showed degenerative changes at C5-C6 and C6-C7 (Tr. 225). In June, 2009, bone mineral density studies showed low bone mass (Tr. 229). A March, 2012 chest x-ray was unremarkable (Tr. 230). August, 2012 ophthalmological records show that Plaintiff underwent a lens implant procedure to the right

eye after a diagnosis of cataracts (Tr. 196-198, 203, 210-211). August, 2012 records state that she was concerned that the heavy lifting performed as her mother's care giver was not good for her eyes (Tr. 218). September, 2012 treating records by Katherine French, M.D. state that Plaintiff had "retired early from the Dept. of Labor" and was "[o]verall, feeling well," but experienced back pain (Tr. 175). Plaintiff reported that she was taking care of her 100-year-old mother (Tr. 175). Dr. French made note of the condition of degenerative disc disease of the spine (Tr. 174). December, 2012 treating records note that Plaintiff experienced neck and back pain caring for her mother (Tr. 172). Dr. French noted that Plaintiff was able to walk normally and appeared "healthy and well-nourished" (Tr. 172).

February, 2013 chiropractic records note Plaintiff's report of dizziness, backaches, arthritis, neck pain, and Carpal Tunnel Syndrome ("CTS") (Tr. 232, 250). Plaintiff demonstrated 4-5/5 strength in the bilateral wrists (Tr. 235). She exhibited a reduced range of cervical and lumbar spine motion (Tr. 233). The following month, Plaintiff rated her pain at level "eight" on a scale of one to ten (Tr. 243). Dr. French's April, 2013 records note a diagnosis of diabetes mellitus (Tr. 170). Dr. French noted a normal gait and station and normal movement in all extremities (Tr. 169).

A May, 2013 mammogram showed no signs of malignancy (Tr. 223). Chiropractic records from May, 2013 note Plaintiff's report of back pain after lifting and carrying her mother from the bed to a chair (Tr. 246). June, 2013 records note that Plaintiff was "ambulating normally" and felt "100 [percent] better" since taking Metformin for diabetes

(Tr. 168). She reported that she spent her weekend "working in the garden" (Tr. 247). A chest x-ray was unremarkable (Tr. 230, 350). A mammogram showed no recurrence of cancer (Tr. 194, 347, 349, 351). Plaintiff reported that her back pain had lessened because she was no longer required to lift her mother, who had recently passed away (Tr. 348). Plaintiff reported that she was feeling well (Tr. 194). Ophthalmological notes state that Plaintiff experienced vision glare occasionally while driving at night (Tr. 275). Chiropractic records from the following month rate Plaintiff's level of back pain at "four" (Tr. 248).

In August, 2013, Albert Spickers, M.D. composed a letter on Plaintiff's behalf, opining that due to osteoporosis, degenerative disc disease of the lumbar and cervical spine, and CTS, Plaintiff was unable to perform the sitting, lifting, pulling, and keyboarding functions necessary to perform "general office activities" (Tr. 252).

In October, 2013, Dr. French performed an assessment of Plaintiff's work-related activities, finding that she was unable to lift even 10 pounds or stand or walk for two hours in an eight-hour workday[1] (Tr. 260). Dr. French found that Plaintiff required position changes every 20 minutes (Tr. 261). She found that Plaintiff's ability to push and pull in both the upper and lower extremities was compromised by CTS and degenerative disc disease of the lumbar spine and that she was precluded from all climbing, balancing, kneeling, crouching, and crawling (Tr. 261). Dr. French found that Plaintiff's manipulative

_____

[1]Although Plaintiff's entitlement to DIB expired on September 30, 2013, the October, 2013 treating records and opinions are relevant to her condition prior to the expiration of benefits.

functions were compromised by CTS and noted a diagnosis of glaucoma (Tr. 262). She found that due to CTS, Plaintiff should avoid more than limited exposure to temperature extremes, vibration, humidity, and hazards (Tr. 262). Eleven days later, Dr. Spickers completed an identical medical source statement form, making almost exactly the same findings as Dr. French[2] (Tr. 268-271). Notes from a visual examination performed the same month note 20/25 vision on the left and 20/20 on the right (Tr. 272). Plaintiff was advised to continue taking drops for glaucoma (Tr. 273).

### 2. Records Pertaining to Plaintiff's Condition After the September 30, 2013 Expiration of Benefits

In June, 2014, Plaintiff underwent surgery for a right distal radius fracture after falling from a ladder (Tr. 279, 283, 290, 331, 335). Treating records state that Plaintiff fell after experiencing a vasovegal episode due to pain (Tr. 286). A clinical examination of the wrists and fingers was neurologically unremarkable (Tr. 300-301). An EKG was unremarkable (Tr. 294). Followup notes from later the same month state that Plaintiff denied joint pain (Tr. 305-306). Dr. French's records note that Plaintiff was able to ambulate "normally" but reported "lightheadedness" (Tr. 323, 325). Dr. French noted a 2004 diagnosis of bilateral CTS (Tr. 335). July through September, 2014 followup notes state that Plaintiff was precluded from heavy housekeeping due to mild weakness and swelling at the incision site

---

[2]

Dr. Spicker's findings differ from Dr. French's on only two minor points: In the manipulative functioning category, he found that she did not experience limitations in "feeling" and in the environmental functioning category, declined to find that Plaintiff should avoid humidity (Tr. 265).

and that she took narcotics for pain relief (Tr. 297, 309, 313, 321). She was advised to undergo occupational therapy (Tr. 316, 321). A bone density imaging study showed the condition of osteopenia (Tr. 338).

In October, 2014, Dr. Spickers, noting that a May, 2014 wrist fracture exacerbated Plaintiff's conditions of CTS and osteoporosis, found that she was disabled from all work (Tr. 268-269). He noted that she was unable to tolerate non-steroidal pain medication except for codeine and Tylenol, but refrained from taking pain medication due to side effects (Tr. 268). He noted further that prior to the May, 2014 fracture, Plaintiff had experienced "numerous" falls due to unsteadiness and was unable to keyboard for even short durations (Tr. 268). Dr. Spickers noted Plaintiff had attempted to procure work, but was told that her need to keep snacks at her desk and change position at regular frequencies would preclude employment (Tr. 269). He concluded that she was disabled from all work (Tr. 269).

### 3. Consultative and Non-Treating Records

In September, 2013, R. Scott Lazzara, M.D. performed a consultative physical examination, noting Plaintiff's report of breast cancer in remission but symptoms of osteoporosis resulting from chemotherapy (Tr. 253). Dr. Lazzara noted that Plaintiff did not require the use of a cane or walker (Tr. 253). Plaintiff reported that she could perform household chores, shop, and walk up to one quarter of a mile, but required position changes every 20 minutes and avoided squatting and kneeling (Tr. 253). Dr. Lazzara observed the ability to perform gross and fine manipulative activities and normal muscle tone and strength

(Tr. 256-25).  He found that Plaintiff remained "neurologically stable" (Tr. 257).

Later the same month, Quan Nguyen, M.D. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding "no evidence" to support Plaintiff's claim that she was unable to stand or sit for more than 20 minutes at a time (Tr. 63).  He found that Plaintiff could lift 50 pounds occasionally and 25 frequently; sit, stand, or walk for about six hours in an eight-hour workday; and push and pull without limitation (Tr. 64).  He found that Plaintiff was limited to occasional climbing of ladders, ramps, and scaffolds but did not experience additional postural limitations (Tr. 64).  He found no manipulative, visual, communicative, or environmental limitations (Tr. 64-65).

### C.    Vocational Expert Testimony

VE James M. Fuller classified Plaintiff's former work as a vocational rehabilitation counselor as skilled and exertionally sedentary[3]  (Tr. 54).  The ALJ then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education and work experience:

> [A]ssume a person . . . who can perform at not more than the medium
> exertional level, with the following limitations: no more than occasional

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

climbing, and that includes ladders, ropes, scaffolding, ramps, and stairs (Tr. 54).

The VE testified that the hypothetical individual could perform Plaintiff's past relevant work as a vocational rehabilitation counselor (Tr. 54).

The ALJ then amended the above question to include additional limitations:

[T]his hypothetical person can perform at not more than the light exertional level; must have a job where the person can alternate between sitting and standing up to four times per hour; cannot climb any ladders, ropes, or scaffolding; limited to only occasional climbing of ramps or stairs; only occasional balancing, stooping, or crouching; cannot have constant rotation or flexion or extension of the neck . . . . Must avoid concentrated exposure to extreme cold and to hazards like dangerous machinery and unprotected heights. Finally, this person needs a job that would allow the person to be off task up to 10 percent of the typical workday for health reasons. Now, with those changes, does that change whether this person could perform the past voc rehab counselor job? (Tr. 55).

In response, the VE stated the additional limitation would not preclude Plaintiff's past relevant work (Tr. 55). The ALJ posed a third hypothetical question to the VE:

This person can perform at not more than at the sedentary level of exertion, lifting or carrying no more than five pounds. Limited to no more than brief climbing of ramps or stairs. By brief, I mean it no more than 10 percent of the typical workday. Cannot constantly reach, including overhead, or perform gross manipulation or fine manipulation, with the right, dominant, upper extremity. And all of the manipulative limitations deal with the right, dominant, upper extremity. Much avoid concentrated exposure to wetness and humidity, in addition to the extreme cold, and to excessive vibration. Now, with those changes, does that change whether this person could perform the past job as a voc rehab counselor (Tr. 55-56)?

The VE stated that the ability to perform "constant reaching, gross and fine limitations" would still allow for work as a vocational rehabilitation counselor (Tr. 56).

However, he testified further that if the same individual were limited to "occasional writing or keyboarding" with the right upper extremity, the former work would be eliminated (Tr. 56). He testified that the restriction to occasional writing or keyboarding with the right upper extremity would also eliminate all transferable skills (Tr. 56). He concluded by stating that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") with the exception of his findings regarding a "sit/stand" option which were based on his own professional experience (Tr. 56-57).

In response to questioning by Plaintiff's attorney, the VE stated that if the hypothetical individual were required to take three five-minute breaks each hour to stand up and "move about," all competitive employment would be eliminated (Tr. 57).

### D. The ALJ's Decision

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "diabetes mellitus, CTS, obesity, osteopenia of the hip and lumbar spine, degenerative disc disease of the cervical, lumbar and thoracic spine, and degenerative joint disease of the knees" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 13-14). He found that the conditions of breast cancer (for which Plaintiff no longer required medication) and a cataract to the right eye were non-severe impairments (Tr. 13). He found that the condition of "fractured right wrist," which occurred in May, 2014 was irrelevant to his analysis because it had occurred after the September 30, 2013 expiration of DIB benefits (Tr. 13). The ALJ

found that Plaintiff had the Residual Functional Capacity ("RFC") for sedentary work with

the following additional limitations:

> [C]laimant is able to lift no more than five pounds and must be able to alternate between sitting and standing up to four times per hour. She is unable to climb ladders, ropes or scaffolds and can only briefly climb ramps and stairs (up to 10 percent of the workday). She is only occasionally able to balance, stoop and crouch, but is unable to constantly rotate, flex or extend her neck and is unable to constantly reach overhead or perform gross manipulation or fine manipulation with her right upper extremity. All of the manipulative limitations deal with only the right upper extremities. She must avoid exposure to extreme cold, wetness and humidity and to excessive vibration and hazards, such as dangerous machinery and unprotected heights. She must be permitted to be off task up to 10 percent of the workday for health reasons (Tr. 15).

Citing the VE's testimony, the ALJ found that Plaintiff could perform her past relevant work

as a vocational rehabilitation counselor (Tr. 22).

The ALJ discounted Plaintiff's alleged degree of limitation (Tr. 17-22). He cited

April, 2013 treating records stating that she felt "100 percent better" since a change in

diabetes medication (Tr. 18). The ALJ noted that within the relevant period, she denied

"weakness, dizziness, numbness, or pain" (Tr. 18). He cited Dr. Lazzara's September, 2013

consultative observations that Plaintiff was able to perform household chores, shop, use

computers, stand or sit for up to 20 minutes, walk a quarter of a mile, lift 20 pounds, and

perform fine and gross manipulative activities (Tr. 18). The ALJ noted that until 2013,

Plaintiff had cared for her aged mother and took an early retirement in 2010 to care for her

mother rather than as a result of a disability (Tr. 18, 21). He noted that Plaintiff's ability to

lift her mother and assist her with self care functions stood at odds with the claim of physical

limitations (Tr. 18).

### III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir.  1985).  Substantial evidence is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.  1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight."  *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

Plaintiff makes four arguments for remand. *Plaintiff's Brief,* 11-21, *Docket #16*, Pg ID 416. First, she disputes the ALJ's conclusion that her allegations of disability were not credible. *Id.* at 11-15. Next, she argues, in effect, that the ALJ's partial rejection of Drs. Spickers' and French's findings was based on an erroneous reading of the treating physicians' opinions. *Id.* at 15-18. Third, she contends that the ALJ failed to account for limitations resulting from medication side effects. *Id.* at 19-20. Last, she argues that the RFC for less than constant use of the right upper extremity (coupled with the conclusion that she could perform her past work as a vocational rehabilitation counselor) is not supported by the VE's

testimony. *Id.* at 20-21.

Arguments One and Three both pertain to the ALJ's credibility determination and can be considered in tandem. Arguments Two and Four will be discussed separately.

## A. The Credibility Determination (Arguments One and Three)

Plaintiff disputes the ALJ's finding that her claims were not credible. *Plaintiff's Brief* at 11-15 (*citing* Tr. 16-22).

The credibility determination, currently guided by SSR 96-7p, describes a two-step process for evaluating symptoms.[4] "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment ... that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2 (July 2, 1996). The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."[5] *Id.*

---

[4]

In March, 2016, SSR 16-3p superceded SSR 96-7p. The newer Ruling eliminates the use of the term "credibility" from SSA policy. SSR 16-3p, 2016 WL 1119029, *1 (Mar. 16, 2016). The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." See 20 C.F.R. § 404.1529(c)(3), fn 7, below. Nonetheless, SSR 96-7p applies to the present determination, decided on December 16, 2014. See *Combs v. CSS*, 459 F.3d 640, 642 (6th Cir. 2006)(*accord* 42 U.S.C. § 405(a))(The Social Security Act "does not generally give the SSA the power to promulgate retroactive regulations").

[5]

In addition to an analysis of the medical evidence, 20 C.F.R. 404.1529(c)(3) lists the

Plaintiff faults the ALJ for finding that she retired in 2010 to take care of her elderly mother (Tr. 21), noting that the record does not actually indicate that she retired for that purpose. *Plaintiff's Brief* at 12. Defendant concedes that the record does not expressly state that Plaintiff took an early retirement for the purpose of caring for her mother. *Defendant's Brief,* fn 1, *Docket #21,* Pg. ID 447. However, despite Plaintiff's claim to the contrary, the inference that she quit work to care for her mother rather than as a result of disability is supported by the record. The ALJ cited the September, 2012 treating records (noting that Plaintiff took an early retirement in 2010 and was currently taking care of mother) stating that she felt "well" (Tr. 17, 175). The record does not contain evidence showing that Plaintiff, a federal employee, sought or received a disability retirement. The ALJ noted that the record amply supports the finding that Plaintiff's activities in caring for her mother well exceeded the job requirements of her former, sedentary work.

Moreover, the ALJ's additional reasons for discounting Plaintiff's credibility are well supported by the record. The ALJ cited chiropractic records from the first half of 2013 showing that Plaintiff experienced back pain as a result of lifting her mother "into a

---

factors to be considered in making a credibility determination: (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

wheelchair" (Tr. 17, 218, 246). Notably, Plaintiff later reported that her back pain ceased after her mother died because she no longer had to perform heavy lifting (Tr. 348). The ALJ cited Plaintiff's April, 2013 that she felt "100 percent" better after a change in medication and a June, 2013 report that she was not in pain (Tr. 18, 168, 246). The ALJ did not err in finding that Plaintiff's June, 2013 report that she spent the weekend gardening (Tr. 247) undermined her claims that she was unable to perform any significant postural or manipulative activities or that the claims of extreme limitation were contradicted by the treating records showing that she broke her wrist in May, 2014 while standing on a ladder cleaning a ceiling fan (Tr. 18, 21).

In addition, the ALJ permissibly found that Plaintiff's attempts to obtain employment after her mother died undermined her disability claim (Tr. 18). "There is 'no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.'" *Workman v.CSS.*, 105 Fed.Appx. 794, 801–02, 2004 WL 1745782, at *7 (6th Cir. July 29, 2004)(*citing Bowden v. CSS,* 1999 WL 98378, at *7 (6th Cir. Jan.29, 1999)). Likewise here, Plaintiff's attempts at procuring employment imply that she was "ready and willing to work." While Plaintiff alleges that she was denied employment due to various physical limitations, the ALJ did not err in noting the applications for employment, coupled with the treating records showing that she engaged in fairly strenuous activity, stood at odds with the allegations of disability.

On a related note, Plaintiff argues that her sporadic activities, as testified to at the hearing, did not equate to the ability to perform full-time work. *Plaintiff's Brief* at 14. However, the ALJ noted that her September, 2013 admission to Dr. Lazzara that she could do household chores, grocery shop, play computer games, work with "phone apps," and walk one quarter of a mile undermined her claim that she engaged in severely limited activities of daily living (Tr. 18, 253). While Plaintiff cites her testimony that she "never did any significant shopping on her own" (Tr. 42) the limitations described at the hearing appear to refer to her condition in the months post-dating the May, 2014 wrist fracture. *Plaintiff's Brief* at 14. The ALJ correctly noted that limitations brought about by the 2014 injury were "irrelevant for purposes of determining whether she was disabled" prior to the date last insured of September 30, 2013 (Tr. 13). He did not err in concluding that the treating and consultative records pertaining to the relevant period supported a non-disability finding.

Finally, Plaintiff argues that the ALJ failed to account for her concentrational limitations brought about by medication side effects. *Plaintiff's Brief* at 19-21. Plaintiff cites Dr. Spicker's October, 2013 statement that she experienced the medication side effects of "significant fatigue and the inability to concentrate." *Id.* at 19 (*citing* Tr. 267).

Plaintiff is correct that in making a credibility determination, an ALJ must consider "[t]he type, dosage, effectiveness, and side effects of any medication" taken for pain relief. 20 C.F.R. 404.1529(c)(3)(iv). However, the ALJ's allegations of medication side effects is well supported and explained. He acknowledged the allegations of concentrational problems

due to medication side effects but noted that the claims were undermined by the fact that "she had applied for and interviewed for similar [skilled] work that she had done in the past" (Tr. 19). More obviously, Plaintiff's claim of medication side effects affecting her potential work performance is contradicted by Dr. Spickers' October, 2013 and October, 2014 statements that Plaintiff refrained from taking pain medication during the day (Tr. 266, 268).

Because the credibility determination is generously supported by the record, a remand on this basis is not warranted. *See Cruse v. CSS*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination entitled to deference); *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989))(*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

## B. The Treating Physician Analysis (Argument 2)

Plaintiff argues that the ALJ failed to provide adequate reasons for rejecting Drs. Spickers' and French's disability opinions. *Plaintiff's Brief* at 15-18.

### 1. Basic Principles

"[I]f the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson,* 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's

findings, see *Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004),

provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. §

404.1527(c)(2))[6]. The failure to articulate "good reasons" for rejecting a treating physician's

opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013).

"[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good

reasons in our notice of determination or decision for the weight we give [a] treating source's

opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be

'supported by the evidence in the case record, and must be sufficiently specific to make clear

to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reasons for that weight.' " *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL

374188, *5 (1996)).

### 2. Dr. Spickers' Opinions

The ALJ discussed Dr. Spickers' August, 2013 opinion that Plaintiff was unable to

perform activities such as keyboarding, data entry, sitting, pulling, and pushing as required

for general office activities and was unable to carry even 10 pounds or stand/walk for even

two hours in an eight-hour workday (Tr. 19, 252). The ALJ accorded "little weight" to Dr.

Spickers' August, 2013 opinion on the basis that it contradicted his 2014 opinion reflecting

---

[6]

In explaining the reasons for giving less than controlling weight to the treating physician opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

a lessor degree of limitation (Tr. 19, 252).  The ALJ cited Dr. Spickers' October, 2014 finding that she "may" require "additional accommodations in the future" such as "mobility assistance, elevator use, assistive devices permitting use of laptop or cell phone to alleviate unnecessary physical travel" (Tr. 20, 269).  The ALJ gave "some weight to the extent that it is consistent with the [RFC]" but noted that "there is no evidence that the claimant has any difficulty with walking or any postural limitations that would warrant a finding that would prevent her from stooping, crouching and crawling"[7] (Tr. 20).  The ALJ also discounted the October, 2014 opinion on the basis that it was based in part on limitations brought about by the wrist fracture occurring well after the date last insured (Tr. 20).

Plaintiff is correct in noting that Dr. Spickers' 2013 and 2014 opinions are fairly consistent in terms of exertional and postural limitations and that the two opinions differ only to extent that in the latter opinion, Dr. Spickers' referenced the possibility of future, additional limitations.  *Plaintiff's Brief* at 17.   However, the ALJ  provided otherwise indisputably "good reasons" for declining to accord controlling weight to either of Dr. Spickers' opinions. The ALJ noted that Dr. Spickers' finding of extreme exertional and postural limitation stood grossly at odds with the remainder of the treating and consultative records which showed that she was able to walk normally, lift and carry her elderly mother, and engage in a wide range

---

[7]The ALJ referred to Dr. Spickers' August, 2013 and October, 2014 opinions, but did not reference the treating physician's October, 2013 opinion (Tr. 268-271).  However, in rejecting the 2013 findings, the ALJ appears to cite chiefly to the October, 2013 assessment (Tr. 19, 260-262).

of household, yard, and shopping activities (Tr. 20). My own review of the transcript shows that Dr. Spickers' findings of extreme exertional and postural limitation is unsupported by either the treating or consultative records. Moreover, the RFC including the limitations of avoidance of extreme cold, wetness, humidity, vibration, and hazards is drawn directly from Dr. Spickers' findings (Tr. 15, 265).

### 3. Dr. French's Opinion

The ALJ also acknowledged Dr. French's October, 2013 opinion, but gave it "some weight" to the extent that it was consistent with the RFC (Tr. 20, 260-262). The ALJ permissibly discounted the opinion on the basis that although Dr. French found generalized manipulative limitations, she failed to note that the treating records showed that only the "right upper extremity" had been affected (Tr. 20). The ALJ noted that the disability opinion was also undermined by Plaintiff's attempts to procure employment. While Plaintiff revisits her argument that the ALJ improperly used her efforts to obtain work to undermine the claim, the ALJ did not err in finding that her attempts to secure gainful employment undermined the treating opinions. *See Workman*, *supra,* 105 Fed.Appx. at 801–02.

Likewise, the ALJ did not err in discounting Dr. Nguyen's non-examining finding that Plaintiff was capable of exertionally medium work by noting that Plaintiff "suffere[d] from several musculoskeletal issues that would prevent her from lifting such heavy weight" on a regular basis (Tr. 20, 63-65). While Plaintiff notes that the RFC for sedentary work found in the administrative opinion is not supported by the non-examining findings of Dr. Nguyen

(medium work) and the treating findings (less than sedentary/disability), the ALJ did not err in crafting an RFC drawn from a combination of the treating records and the opinions by treating, consultative, and non-examining sources. *See Rudd v. Commissioner of Social Sec.,* 531 Fed.Appx. 719, 726–27 (September 5, 2013)(*citing Coldiron v CSS*, 391 Fed.Appx. 435, 439 (6th Cir.August 12, 2010) ("'The Social Security Act instructs that the ALJ not a physician ultimately determines a claimant's RFC.... An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding'"). The RFC composed by the ALJ generously accounts for Plaintiff's full degree of exertional and postural limitation, given the treating records showing that she was able to walk without problems and experienced only intermittent back pain.

### C. The Vocational Testimony

Plaintiff argues that the RFC for less than constant manipulative activities with the right upper extremity is based on a mis-communication between the ALJ and VE. *Plaintiff's Brief* at 20-21 (Tr. 15, 56). She is correct that job testimony that does not include all of a claimant's relevant limitations does not constitute substantial evidence. *Ealy v. CSS*, 594 F.3d 504, 516 (6th Cir.2010); *Varley v. Commissioner of HHS*, 820 F.2d 777, 779 (6th Cir.1987); see also *Teverbaugh v. CSS*, 258 F.Supp.2d 702, 706 (E.D.Mich.2003) (Roberts, J)(reversible error for ALJ to rely upon unsupported job findings).

Plaintiff notes a discrepancy between the hypothetical question forming the basis of the RFC (Tr. 15, 55-56) and the VE's responding testimony. While the ALJ's question

regarding a limitation to sedentary work included the modifier "[c]annot constantly reach, including overhead, or perform gross manipulation or fine manipulation with the right, dominant, upper extremity" (Tr. 55-56), the VE replied that a restriction to sedentary work with "*constant* reaching, gross and fine limitations" would allow Plaintiff to perform her past relevant work (Tr. 56). (Emphasis added). The VE next testified that a limitation to occasional manipulative activity would preclude the past work (Tr. 56). The ALJ apparently believed that the VE testified that "less than constant" manipulative activity would allow Plaintiff to perform her former work when in fact, the testimony did not answer the question of whether the ability to perform manipulative activities less than constantly but more than occasionally would allow Plaintiff to return to her previous job.[8]

In response, Defendant contends that the argument that the RFC reflects a mis-communication between the ALJ and VE is "entirely speculative" and "irrelevant." *Defendant's Brief* at 24. She notes that the job of vocational rehabilitation counselor, as generally performed, requires only occasional reaching, handling, and fingering. *Id.* (*citing DOT* § 045.107-042, 1991 WL 646629).

First, Defendant's argument that the possibility of mis-communication is "speculative"

---

[8] "[L]ess than constant" but more than occasional would allow for "frequent" manipulative activity. In Social Security parlance, occasional activity "means occurring from very little up to one-third of the time" whereas "frequent" refers to activity "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at *5–6 (January 1, 1983).

is contradicted by the hearing transcript showing that while the ALJ's question included the modifier "less than constant" (Tr. 55-56), the VE's answer was clearly based on the modifier "constant" (Tr. 56). In contrast, Defendant's argument that the mis-communication was "irrelevant" is a closer call. A Step Four determination that a claimant can resume her previous occupation can be supported by the finding that claimant can perform past relevant work as "actually performed," or, "as generally required by employers throughout the national economy." SSR 82–61, 1982 WL 31387, *2 (1982). Defendant contends, in effect, that the DOT shows that Plaintiff can do her past relevant work "as generally required."

However, the VE's November, 2014 testimony that the former job requires more than occasional manipulative activity stands directly at odds with the DOT's 1991 description of vocational rehabilitation counselor. Moreover, Defendant's argument that the DOT automatically trumps the VE's testimony has been rejected by the Sixth Circuit. "[T]he ALJ and consulting vocational experts are not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's definitions." *Wright v. Massanari,* 321 F.3d 611, 616 (6th Cir. 2003) (*citing Conn v. Sec'y of HHS,* 51 F.3d 607, 610 (6th Cir. 1995)).

The Court is mindful that the ALJ was not required to use VE testimony in making the Step Four determination. *Studaway v. HHS*, 815 F.2d 1074, 1076 (6th Cir.1987); *Mays v. Barnhart,* 78 Fed. Appx. 808, 813–814, 2003 WL 22430186, *4 (3rd Cir. October 27, 2003) ("At step four of the sequential evaluation process, the decision to use a vocational expert is

at the discretion of the ALJ").   However, because the ALJ stated explicitly that he relied on

the vocational testimony in making the Step Four finding (Tr. 22), his erroneous belief that

the testimony allowed for "less than constant" manipulative activity constitutes requires a

remand for clarification.   Although the use of a VE is optional in making a Step Four finding,

"the propriety of the hypothetical question ... is a proper concern for the Court, since it may

furnish relevant information that the ALJ may consider in determining whether the plaintiff

could do her past work." *Merkel v. CSS*, 2008 WL 2951276, *4 (E.D.Mich. July 29, 2008)

(Lawson, J.)(citing 20 C.F.R. § 404.1560(b)).   Thus, the ALJ's reliance on the VE's testimony

was not "irrelevant" to the Step Four finding.

The ALJ's erroneous finding that the VE testified that "less than constant," *i.e.*

frequent  manipulative activity would allow Plaintiff to perform her past relevant work is not

supported by substantial evidence.  *Teverbaugh, supra,* 258 F.Supp.2d at 706.[9]   As such, the

ALJ's reliance (and misinterpretation) of  the vocational testimony in crafting the RFC

requires a remand for further fact-finding.

While a remand to the administrative level is warranted for the above-discussed

reasons, I decline to recommend a remand for an award of benefits.  An award of benefits is

appropriate "only if all essential factual issues have been resolved and the record adequately

establishes a plaintiff's entitlement to benefits." *Faucher v. HHS*, 17 F.3d 171, 176 (6th Cir.

---

[9]While *Teverbaugh* pertained to a "Step Five" finding, the ALJ's reliance on the
misinterpreted testimony in support of the RFC likewise requires a remand.

1994). In this case, a remand for benefits prior to the resolution of the unresolved factual issues would be premature. As such, I recommend a remand for further administrative proceedings consistent with the above findings.

## CONCLUSION

For these reasons, I recommend that Plaintiff's motion for summary judgment [Doc. #16] be  GRANTED to the extent that the case is remanded for further administrative proceedings consistent with my findings in section **C** of the analysis and that Defendant's motion for summary judgment [Doc. #21] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.

Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R.  Steven Whalen_____
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: April 28, 2017

## CERTIFICATE OF SERVICE

I hereby certify on April 28, 2017, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants.


s/Carolyn Ciesla 
Case Manager to
Magistrate Judge R. Steven Whalen